# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00649-CR

**James Rex McCelvey, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT NO. 995058, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING

### O P I N I O N

Appellant James Rex McCelvey, an operator of a retail public utility that possessed a certificate of convenience and necessity, appeals his third-degree felony conviction under the Texas Water Code, for willfully and knowingly failing to render continuous and adequate service on or about March 19, 1997, within the utility's certified area. The indictment alleged that the water supplied exceeded the maximum contaminant level of 0.005 milligrams per liter for benzene set by the Texas Administrative Code, Title 30, section 290.103(3)(B) and in violation of Title 30, section 291.93 of the same code. *See* Tex. Water Code Ann. §§ 13.250(a), 13.415 (West 2000); 30 Tex. Admin. Code §§ 290.103(3)(B),[1] 291.93[2] (1997).

---

[1] The current code provisions are to be found in 30 Tex. Admin. Code § 104(c)(2) (2004).

[2] The current code provisions are to be found in 30 Tex. Admin. Code § 291.93(a) (2004).

The jury found appellant guilty under count II of the indictment. The trial court assessed appellant's punishment at five years' imprisonment. The imposition of the sentence was suspended and the appellant was placed on community supervision for five years subject to certain conditions including the payment of a $5,000 fine.

## Points of Error

Appellant advances two points of error. He contends therein that the evidence is legally and factually insufficient to sustain the conviction.

## Legal Background

This case is apparently one of first impression—a criminal conviction under Chapter 13 of the Texas Water Code. Appellant was indicted for an offense under sections 13.250(a) and 13.415 of the water code, an offense outside the Texas Penal Code. The penal code does not define all criminal conduct. A number of criminal offenses are defined by other codes. *See* 6 Michael B. Charlton, *Texas Practice: Criminal Law* § 1.2 (2001) (hereinafter Charlton). The penal code, however, attempts to limit the scope of penal laws, and makes some effort at uniformity. *Id.*[3]

---

[3] Section 1.03(a), (b) of the Penal Code provides:

(a) Conduct does not constitute an offense unless it is defined as an offense by statute, municipal ordinance, order of a county commissioners court, or rule authorized by and lawfully adopted under a statute.

(b) The provisions of Titles 1, 2, and 3 apply to offenses defined by other laws, unless the statute defining the offense provides otherwise; however, the punishment affixed to an offense defined outside this code shall be applicable unless the punishment is classified in accordance with this code.

Tex. Pen. Code Ann. § 1.03(a), (b) (West 2003). Section 1.03 appears to make the penal code

We believe that a discussion first of the legal background of the case will place appellant's contentions in proper perspective. Section 13.415 of the water code provides:

> Any person who willfully and knowingly violates this chapter is guilty of a third degree felony.

Tex. Water Code Ann. § 13.415 (West 2000).[4]

The term "violates this chapter" is not further clarified. Conduct in the form of an act or omission is not mentioned. *See* Tex. Pen. Code Ann. § 6.02 (West 2003). Obviously, "this chapter" would include all subchapters, sections, subsections, and provisions found therein. Chapter 13 consists of subchapters A through N, sections 13.001-13.515, and generally concerns discontinuance, reduction, and impairment of service.

In the instant case, under count II of the indictment, the prosecution has chosen section 13.250(a) out of subchapter G as the basis of prosecution under section 13.415. Section 13.250(a) provides:

> (a) Except as provided by this section or Section 13.2501 of this code, any retail public utility that possesses or is required to possess a certificate of public

---

supreme to all offenses defined elsewhere. *See* 6 Michael Charlton, *Texas Practice: Criminal Law* § 1.2 (2001). All statutes listed under Titles 1, 2 and 3 of the penal code (§§ 1.01-12.51) apply to all offenses defined outside the penal code. Tex. Pen. Code Ann. § 1.03(b) (West 2003). Accordingly, the general purposes of the penal code, *see* Tex. Pen. Code Ann. § 1.02(2), (4) (West 2003), the definitions set forth in section 1.07(a), *see* § 1.07(a) (West 2003) and conduct constituting an offense, *see id.* § 6.01 (West 2003), all apply to offenses established by the legislature.

[4] An individual adjudged guilty of a felony of the third degree shall be punished by imprisonment in the institutional division for any term of not more than ten years or less than two years, and, in addition, a fine not to exceed $10,000. *See* Tex. Pen. Code Ann. § 12.34(a), (b) (West 2003).

> convenience and necessity shall serve every consumer within its certified area and shall render continuous and adequate service within the area or areas.

Tex. Water Code Ann. § 13.250(a) (West 2000).

The State relied upon the phrase "and shall render continuous and adequate service within the area or areas." This language imposed a duty upon any retail public utility as described in the statute. The State alleged an omission thereunder—the failure to render adequate service. The exception to the statute is found in section 13.2501, which is not an issue in this case.[5] *See also* Tex. Pen. Code Ann. § 6.02 (West 2003).

### Indictment

The indictment originally contained nine counts. At trial, the State elected to proceed only on count II, which had been twice amended. The amended count II of the indictment, omitting the formal parts, provided that on or about March 19, 1997, appellant:

> while operating a retail public utility that possessed a certificate of public convenience and necessity, to wit: the Choke Canyon Water System, did then and there willfully and knowingly fail to render continuous and adequate service within its certified area, to wit: the water contained levels of benzene concentrations that exceeded the Maximum Contaminant Level of 0.005 mg/l for benzene under the Drinking Water Standards for Public Water Supply Systems, Title 30, Section

---

[5] Section 13.2501 provides:

> The holder of a certificate of public convenience and necessity shall refuse to service a customer within its certified area if the holder of the certificate is prohibited from providing the service under Section 212.012 or 232.0047, Local Government Code.

Tex. Water Code Ann. § 13.2501 (West 2000).

4

290.103(3)(B) of the Texas Administrative Code, and in violation of title 30, Section 291.93 of the Texas Administrative Code. And further, [Appellant] was not required to refuse to serve a customer within the certified area and was not prohibited from providing the service under Section 13.2501 of the Texas Water Code.

These allegations sought to charge appellant with an omission—a failure to render the duty of providing continuous and adequate *service* under section 13.250(a) of the water code. Title 30 of the Texas Administrative Code contains regulations concerning environmental quality. Chapter 290 thereof is titled "Water Hygiene" and subchapter F of Title 30 includes the regulations regarding drinking water standards governing quality and reporting requirements for public water supply systems. *See* 30 Tex. Admin. Code chapter 290 (1997), in effect at the pertinent time periods. Section 290.101 provides in part:

The purpose of these standards is to assure the safety of public water supplies with respect to microbiological, chemical, and radiological quality and to further efficient processing through control tests, laboratory checks, operating records, and reports of public water supply systems.

30 Tex. Admin. Code § 290.101 (2004).[6]

Section 290.103(3)(B) relates to violatile organic chemicals (VOCs). This section provides that the maximum contaminant level for the VOCs apply to community water systems and

---

[6] The current code is cited for convenience. The quoted part of section 290.101 has remained unchanged from the time of alleged offense. 30 Tex. Admin. Code section 290.101 was adopted to be effective April 15, 1994, 19 Tex. Reg. 2242; amended to be effective September 11, 2000, 25 Tex. Reg. 8880.

such level for benzene is 0.005 MCL (mg/l).[7]  Section 291.93(b) of Title 30 of the administrative code provides:

> (b) Quality of product.
>
>> (1) Each retail public utility which possesses or is required to possess a certificate of convenience and necessity shall furnish water which meets the minimum quality criteria for drinking water prescribed by the commission. A utility or water supply corporation which is authorized to operate without a certificate of convenience and necessity pursuant to § 13.242(c) of the code may be required by the executive director to meet the minimum criteria prescribed by the commission if so instructed in writing.
>
>> (2) Each retail public utility must promptly take all reasonable actions necessary to protect the health of its customers at all times.
>
> (c) Maintenance of Facilities.  Every retail public utility shall maintain its facilities to protect them from contamination, ensure efficient operation and promptly repair leaks.

30 Tex. Admin. Code § 291.93(b) (1997).[8]

The State takes the position that the offense arose under the water code, and that references in the indictment to the administrative regulations were made only to provide notice to appellant as to the manner in which how the prosecution intended to prove failure to render adequate water service.  The State denies any attempt in count II to "criminalize" the administrative regulations set forth in the  amended indictment.

---

[7]  The witnesses used the terminology of "five micrograms per liter of benzene" as the maximum contaminant level testifying that it was the same as "0.005 mg/l."

[8]  The provisions of 30 Tex. Admin. Code section 291.93(b) adopted to be effective October 9, 1990, 15 Tex. Reg. 4019; amended to be effective January 10, 1996, 21 Tex. Reg. 114.

There was no motion to quash or set aside count II of the indictment at trial. *See* Tex. Const. art. V, § 5; Tex. Code Crim. Proc. Ann. art. 1.14(b) (West Supp. 2004). Other than his legal and factual sufficiency issues, appellant has not challenged the pleadings nor questioned the constitutionality of the statutes involved.

**Facts**

The record reflects without dispute that at all pertinent times appellant James Rex McCelvey operated the Choke Canyon Water System, a retail public utility that possessed a certificate of public convenience and necessity, located in Live Oak and McMullen Counties.[9] Sometime in the early 1980s, appellant acquired the Wheeler well, which had been drilled by the Shell Oil Company and capped. Appellant converted the well into a water well. He began supplying water to certain individuals and companies, obtained a certificate of convenience and necessity, and began to use other wells, the Woodward and Horton wells. Appellant incorporated the El Oso Water System into his own, and established a water treatment plant for water taken from Choke Canyon Lake built by the United States Corps of Engineers. Drought came to South Texas and in the summer of 1995, the lake water level fell and the United States Department of the Interior, Bureau of Reclaimation "would not permit appellant to extend his pipes further into the lake." The water

---

[9] The indictment was returned by a Travis County grand jury. The cause was tried in the 147th Judicial District Court of Travis County. Section 13.419 of the Texas Water Code provides:

> Suits for injunction or penalties under this chapter may be brought in Travis County, in any county where this violation is alleged to have occurred, or in the county or residence of any defendant.

Tex. Water Code Ann. § 13.419 (West 2000). No question of proper venue has been raised.

7

treatment plant was closed, and appellant turned to his water wells including the Wheeler well, as a continuing source of water for some of his customers.

The record deals primarily with the offense charged but is also indicative of appellant's ongoing turbulent relationship with the Texas Natural Resources Conservation Commission (TNRCC), now the Texas Commission on Environmental Quality,[10] about compliance with numerous regulations.

The instant case mostly concerns the water samples taken from the Wheeler well at entry point number one[11] and the test results showing benzene in drinking water being distributed. The record shows, and appellant acknowledges, that benzene is a volatile organic chemical that may cause cancer if a person is exposed to a significant amount of it. Benzene is absorbed through a person's digestive system and may affect bone marrow and cause leukemia. Texas has adopted the federal standards, and as noted, the maximum contaminant level for benzene is 0.005 milligrams per liter or five micrograms per liter.

The record is silent as to whether Choke Canyon Water System had any difficulty with benzene in its water sources prior to December 8, 1995. The system was apparently on an annual or less frequent inspection schedule before that date. On December 8, 1995, the water from entry point number one at the Wheeler well tested at 9.8 micrograms of benzene per liter, exceeding the maximum contaminant level.

---

[10] As the Commission was known as TNRCC at all pertinent times, we shall use that terminology as it was used at trial.

[11] All test data mentioned concerns water taken from entry point number one of the Wheeler well unless otherwise noted.

8

Further tests by the TNRCC on January 12 and 19, 1996, of the Wheeler well water reflected benzene in the amount of 9.2 and 9.4 micrograms per liter, respectively. Manuel Saenz of TNRCC orally instructed James Jones, appellant's operator, to shut off the Wheeler well in January after the above test results were available. On January 24, 1996, appellant was sent a written notice of violation and instructed to consult an engineer. He was allowed fourteen days to notify customers of the violation. Mickey Garza, a TNRCC water section manager, testified that on January 25, 1996, Jones told him that the Wheeler well had been taken out of service. Garza reported that as a result, TNRCC "backed off any further monitoring until we could go back and confirm it." In February 1996, the Choke Canyon water system was placed on quarterly monitoring. *See* 30 Tex. Admin. Code § 290.109(b)(15)(A), (B) (1997).

The next testing by TNRCC on the Wheeler well water was on August 28, 1996, which showed that the water contained 5.4 micrograms per liter of benzene at entry point number one. The test on that date of water taken at the Wheeler wellhead showed 11 micrograms of benzene per liter. On September 4, 1996, the test at entry point one reflected that the water there contained 6.3 micrograms of benzene per liter and the test at the Wheeler wellhead showed 14 micrograms of benzene. The test on October 29, 1996, at the said entry point showed less than 5 micrograms per liter of benzene. Still further tests on March 3 and 19, 1997, showed 5.7 and 13 micrograms of benzene per liter in the water taken from entry point number one, respectively. The State used the last testing date as the "on or about" date alleged in the indictment. After March 19, 1997, the Wheeler well was shut down by appellant.

9

Dr. Robert Benson, who holds a Ph.D. in biochemistry and is a toxicologist with the federal Environmental Protection Agency (EPA) in Denver, Colorado, testified for the State. Benson explained that benzene is a known human carcinogen that can cause cancer, and discussed its industrial application and how it may be absorbed by an individual exposed to it. Benson stated that the maximum contaminant level *goal* for benzene is zero because it is a carcinogen. He noted that the principle reason the maximum contaminant level is set at five micrograms per liter of benzene is because that is the level at which chemical laboratories can reliably and accurately measure benzene in a water sample. Dr. Benson observed that the federal and state regulations in this regard were the same. He was of the opinion that drinking water that did not meet the required maximum contaminant level was not adequate.

Dorothy Young, specialist with the enforcement division of TNRCC, testified that she worked on appellant's case from November 30, 1995, until September 1, 1997. She recalled a screening committee meeting on November 30, 1995, and noted that appellant's case was "sort of unusual" as complaints of regulatory violations came from three different directions, the regional office dealing with water pressure and capacity issues and nonresponsiveness, the central office dealing with water quality, and the consumer assistance office concerned with appellant's failure to refund overcharges and illegal fees. Any enforcement action was tabled on November 30, 1995, pending appellant's response to a request that he refund some customers. Young did not recall that any benzene problem was addressed at the meeting. Later, Young became aware of the notice of violation letter of January 24, 1996. On May 13, 1996, a "Notice of Enforcement Action" was sent to appellant by certified mail. It noted the letters of violations dated January 24 and March 28, 1996,

10

and enclosed a proposed agreed order assessing a reduced penalty of $3,296.00 if compliance was completed within certain time limits.

Young had difficulty getting appellant to pick up the certified mail. Young talked to appellant on June 12, 1996, via the telephone. He complained that he was being drowned in paperwork and had "to answer to so many people." Young faxed a copy of the proposed administrative order to appellant. She explained that the order was a "one-shot deal" with time limits. Appellant met with Young and other TNRCC staff members in Austin on June 19, 1996. Young stated that the meeting covered a "lot of territory" about the benzene problem and the hot water being delivered to customers. She further explained that it was confusing as to whether the Wheeler well was in service or not, or only being used in a limited capacity. Appellant stated the Wheeler well served only three customers and that a cooling tower was about to go online.[12] Young testified: "I am not sure what we came away with that day verbally." Consideration was given to amending the earlier proposed administrative order. Young wanted to determine if the Wheeler well was "off" and if the cooling tower had been finally installed. On August 30, 1996, Young learned the results of the benzene tests on August 28th. She then telephoned appellant's staff at the water system about the benzene results and asked them to make sure the Wheeler well was off. On September 4, 1996, Young made a personal trip to the water system and met with Thad Wilkinson, an inspector, and appellant. Other water samples were taken, and a discussion about the benzene

_____

[12] The number of customers given was inaccurate and no cooling tower for the Wheeler well was ever erected.

11

problems followed. Young assumed that the Wheeler well was off, and appellant said a cooling tower would have its electricity within a week.

Thereafter, Young updated the proposed administrative order and mailed it to appellant offering a discount on penalties but giving only a fourteen-day period to respond instead of the normal thirty days. Concerned that appellant would not pick up his mail, Young called the water system staff and stressed the importance of reading the proposed order. On November 18, 1996, Young received a message from appellant asking if they could "talk about this deal." She was unable to reach appellant by telephone that day. On November 19, 1996, the deadline for response, Young received a complaint about a water outage. She reached appellant by telephone. Appellant told Young that he was not going to sign the order, that her agency had pushed him as far as they could. He threatened to sue Young and report her to the Governor. Young described appellant as being belligerent and dismissive of the importance of "what we were trying to do." The deadline for response having passed, Young referred the case to the litigation division of TNRCC. Young sent appellant a letter on December 3, 1996, explaining this action. On February 14, 1997, the litigation division sent appellant a letter informing him that it would seek an administrative penalty of $50,000. When appellant asked for a hearing, TNRCC decided to sue. The case was turned over to the criminal investigation division of TNRCC in February of 1997. A search warrant was executed on appellant's water system property on May 20, 1997. The indictment was returned on October 27, 1999.

Jeff Rowley, a former employee at the Choke Creek Water System, testified for the State. Rowley had worked for appellant from August 24, 1994, until July 1996. He recalled when

the TNRCC discovered benzene in the water from the Wheeler well in January 1996. The agency contacted appellant's staff on January 16, 1996 about one of the tests. On the same day, a certified letter from the agency arrived but the staff, according to appellant's orders, was prohibited from picking it up. Apparently after the second test in January 1996, Manuel Saenz of TNRCC told the staff to shut off the Wheeler well, which they did. When contacted about the situation on January 25, 1996, appellant told his employees to let the customers go without water, "then we can see what the TNRCC wants us to do without any water." Rowley stated that appellant's attitude about water quality was that "if it's wet, it's good." On January 29, 1996, Saenz appeared at the water system bringing a copy of the notice of violation form of January 24, 1996. The notice gave the system fourteen days to notify customers of the benzene violation. Rowley never saw any notice distributed. He reported that an unsuccessful effort was made to run water from the Woodward well to the Wheeler storage tanks. The Wheeler well went back into service after a few days. It was the only source of water for some customers, and the Enron gas plant was "a big account" and needed water. Rowley had never heard of Clarence Littlefield, an engineer who supposedly was consulted, nor did he know of any work on the Wheeler well by the Pawlik Well Service of San Antonio.

James Jones, the operator of appellant's water system during part of the controversy with TNRCC, testified for appellant, his uncle. Jones left the water system in March 1996. To counter the testimony of Young and Rowley, Jones characterized appellant at the time as "just aggravated and not knowing what to do." On January 12, 1996, Thad Wilkinson of TNRCC informed Jones that the Wheeler well water had tested over the maximum contaminant level for

13

benzene at 9.8 micrograms per liter.[13] The Wheeler well was cut off on January 24, 1996, on the oral instructions of Manuel Saenz of TNRCC. Mickey Garza of TNRCC was informed of this action the next day. Upon appellant's instructions, Jones discussed the benzene problem with Clarence Littlefield of Southwest Engineers in Gonzales. The idea of a cooling tower and other options were mentioned. There were other conversations with well service companies. Jones and appellant discussed the notice of violation letter from TNRCC dated January 24, 1996. They concluded the letter did not tell them to shut off the Wheeler well so long as they hired a professional engineer, and gave quarterly notices to their customers about the benzene in the water. The Wheeler well was returned to service despite the earlier oral instructions. It was decided that the drought had caused the benzene to rise to the top of the water table, so a 100-gallon per minute submersible pump was installed on the Wheeler well to eliminate the benzene. Appellant paid the Pawlik Well Service of San Antonio around five thousand dollars for the installation, which was completed on March 7, 1996. This pump did not correct the problem, and the water still contained benzene above the maximum contaminant level.

Clarence Littlefield testified that he quoted appellant a price of $14,543 to erect a cooling tower for the Wheeler well. This quoted price did not include the cost of installation, labor and any sales taxes.[14] Littlefield admitted that he did not construct a cooling tower for appellant.

---

[13] Jones testified that on that date Wilkinson told him "that TNRCC was after Rex's [appellant's] ass."

[14] The State noted that a cooling tower would cost more than $23,000. In jury argument, without objection, the State urged that appellant was more interested in saving money than in protecting the public.

14

Roy McBee, who worked for appellant in other areas, testified that he was employed at the water system in March 1996. He explained the efforts made to blend the water from the Woodward well with that of the Wheeler well to lower the amount of benzene in the water being distributed. This method had been suggested by TNRCC employees, but the efforts were unsuccessful. McBee had worked in oil fields and was not *generally* concerned about contact with benzene, but he testified that he would not want his two-year-old child exposed to drinking water containing benzene.

Appellant introduced on cross-examination of Mike Lannen, a TNRCC employee in the public drinking water section, appellant's letter to Lannen of April 10, 1996, in response to TNRCC's letter of March 28, 1996. Appellant's letter referred to the reworking of the Wheeler well and the fact that water from that well was being blended with water from the Woodward well. Appellant claimed that TNRCC was thus informed the Wheeler well was back in service.

Dr. Lucy Frazier, a toxicologist with ENSR International in Austin, testified that she was employed by TNRCC between 1994 and 1998 in the risk assessment section. Frazier testified that, based on the federal Environmental Protection Agency (EPA) standards published on health risk estimates and toxicity factors or values, the EPA had calculated that if a person was to drink two liters of water a day containing 1 to 10 micrograms of benzene per liter, and that he did so for seventy years, there would be one in a million chances of contracting cancer. Frazier stated these EPA standards showed that if a person drank two liters a day of water containing ten to one hundred micrograms per liter of benzene for seventy years, there would be one in 100,000 chances of contracting cancer. Further, if a person were to drink two liters of water a day containing from 100

15

to 1,000 micrograms of benzene for seventy years, there would be one in 10,000 chances of contracting cancer. Frazier acknowledged that the federal and state maximum contaminant level for benzene was five micrograms per liter. In her personal opinion, she considered ten micrograms of benzene per liter to be safe for drinking water purposes.

Dr. Thomas Dideck, an environmental toxicologist, also testified for the defense to essentially the same opinion as Dr. Frazier. Dr. Robert Benson from the EPA had earlier testified on cross-examination as to the same EPA toxicity factors. He, however, considered any drinking water containing over five micrograms per liter of benzene to be unacceptable, and in his opinion, not an adequate drinking water system.

## Legal Sufficiency

In his first point of error, appellant contends that the "evidence is legally insufficient to prove that appellant failed to provide 'adequate' water, if adequacy is measured by applicable state regulations."

## Standard of Review

In determining whether the evidence is legally sufficient to support the judgment, we view the evidence in the light most favorable to the judgment, asking whether any rational trier of fact could have found beyond a reasonable doubt all the essential elements of the offense charged. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Lane v. State*, 933 S.W.2d 504, 507 (Tex. Crim. App. 1996); *Emery v. State*, 881 S.W.2d 702, 705 (Tex. Crim. App. 1994).

16

The evidence, viewed in this light, and all reasonable inferences drawn therefrom, are evaluated in this review. *See Alvarado v. State*, 912 S.W.2d 199, 207 (Tex. Crim. App. 1995). A reviewing court must consider all evidence, rightly or wrongly admitted, that the trier of fact was permitted to consider. *See Garcia v. State*, 919 S.W.2d 370, 378 (Tex. Crim. App. 1994); *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). The standard of review is the same for both direct and circumstantial evidence cases. *Green v. State*, 840 S.W.2d 394, 401 (Tex. Crim. App. 1992). Appellate courts measure the legal sufficiency of the evidence against a hypothetically correct charge. *See Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). In analyzing a challenge to the legal sufficiency of the evidence, the reviewing court does not realign, disregard, or weigh the evidence. *Margraves v. State*, 34 S.W.3d 912, 917 (Tex. Crim. App. 2000); *Rodriguez v. State*, 939 S.W.2d 211, 218 (Tex. App.—Austin 1997, no pet.). The jury as the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given the testimony, and may accept or reject all or any of any witness's testimony. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Williams v. State*, 692 S.W.2d 671, 676 (Tex. Crim. App. 1984). Reconciliation of evidentiary conflicts is solely the function of the trier of fact. *See Miranda v. State*, 813 S.W.2d 724, 733-34 (Tex. App.—San Antonio 1991, pet. ref'd); *Juarez v. State*, 796 S.W.2d 523, 524 (Tex. App.—San Antonio 1990, pet. ref'd). Moreover, the evidence is not rendered insufficient merely because the defendant presented a different version of the events. *Turro v. State*, 867 S.W.2d 43, 47-48 (Tex. Crim. App. 1993).

At the outset, appellant notes that section 13.250(a) of the water code, under which appellant was convicted, does not define the word "adequate," and, that as a result, the trial court did

not define the term for the jury in its charge.  Appellant contends that this Court must resolve the meaning of "adequate" because the sufficiency of the evidence can only be measured against a "hypothetically correct" jury charge, not the one given at trial.  *Malik*, 954 S.W.2d at 240.  Appellant urges that this is a question of first impression, and this Court must first decide whether the word "adequate" [as used in the statute] is to be construed in light of applicable administrative regulations, and, if so, which regulations.  Appellant argues that if section 13.250(a) is not to be interpreted by the regulations, the question will be what the ordinary meaning of the word was in this case.  While appellant uses phrases such as "adequate water" and "if adequate means safe," he offers no proposed definition of "adequate," which he contends was legally required in the instant case.  What appellant overlooks is that section 13.250(a) imposes a duty on a retail public utility to "render continuous and adequate service."  The indictment charged an omission—a failure to render continuous and adequate service.  As used in the statute and the indictment, "adequate" modifies "service." "Adequate" is not defined in the water code or penal code.  It should be given its ordinary meaning. "Words and phrases shall be read in context and construed according to the rules of grammar and common usage."  Tex. Gov't Code Ann. § 311.011(a) (West 1998); *Ex parte Anderson*, 902 S.W.2d 695, 699 (Tex. App.—Austin 1995, pet. ref'd).  "Adequate" is normally defined as "able to satisfy a requirement; suitable." *American Heritage Dictionary of the English Language* (1973) at 15.  This is the common usage and understanding of the word.  As observed, "adequate" simply modifies "service."

"Service" is defined for the purposes of Chapter 13 of the water code.

18

'Service' means any act performed, anything furnished or supplied, and any facilities or lines committed or used by a retail public utility in the performance of its duties under this chapter to its patrons, employees, other retail public utilities, and the public, as well as the interchange of facilities between two or more retail public utilities.

Tex. Water Code Ann. § 13.002(21) (West 1998).

The application paragraph of the court's charge generally tracked the amended indictment requiring *inter alia*, the jury to find beyond a reasonable doubt that appellant "did then and there willfully and knowingly fail to render continuous and adequate service within its certified area." "Service," being statutorily defined, should have had its definition submitted to the jury in the court's charge. It was not. There was, however, no objection or special requested charge. Interestingly, neither party has cited the section 13.02(21) defining "service" or has discussed it into their briefs. We view the legal sufficiency issue in the light of a "hypothetical correct" jury charge, *Malik*, 953 S.W.2d at 240, which charge would include the said statutory definition.

We interpret a statute in accordance with the plain meaning of its language unless the language is ambiguous or the plain meaning leads to absurd results. *Boykin v. State*, 818 S.W.2d 782, 785-86 (Tex. Crim. App. 1991). We do not find the language in section 13.250(a) of the water code to be ambiguous or that its plain meaning leads to absurd results. We reject appellant's argument that this Court must define "adequate" for the purposes of this case before deciding the legal sufficiency issue he has raised. Moreover, we do not find that the words "adequate service" must of necessity be tied to administrative regulations in alleging a criminal offense.

In the second part of his legal sufficiency argument, appellant asserts that the State failed to prove its case beyond a reasonable doubt because the violation alleged in the indictment was

19

not shown to have been determined by certain provisions of the Texas Administrative Code requiring quarterly monitoring. *See* 30 Tex. Admin. Code § 290.109(b)(11)(A).[15] Appellant asserts that if a violatile organic chemical contaminant listed in section 290.103(3)(B) including benzene has been detected at a level exceeding 0.005 mg/liter or five micrograms per liter, then there must be quarterly monitoring. Appellant argues that his water system was placed on quarterly monitoring in February

---

[15] Subsections (12) and (15)(A), (B) of section 290.109(b) provided:

  (12)  Systems which violate the VOC MCLs of § 290.103(3)(B) of this title, as determined by paragraph (15) of this subsection, must monitor quarterly. After a minimum of four consecutive quarterly samples which show the system is in compliance as specified in paragraph (15) of this subsection and the commission determines that the system is reliably and consistently below the maximum contaminant level, the system may monitor at the frequency and time specified in paragraph (11)(C) of this subsection.

. . . .

  (15)  Compliance with § 290.103(3)(B) of this title shall be determined based on the analytical results obtained at each sampling point.

    (A)  For systems which are conducting monitoring at a frequency greater than annual, compliance is determined by a running annual average of all samples taken at each sampling point. If the annual average of any sampling point is greater than the MCL, then the system is out of compliance. If the initial sample or a subsequent sample would cause the annual average to be exceeded, then the system is out of compliance immediately.

    (B)  If monitoring is conducted annually, or less frequently, the system is out of compliance if the level of a contaminant at any sampling point is greater than the MCL. If a confirmation sample is required by the commission, the determination of compliance will be based on the average of the two samples.

30 Tex. Admin. Code § 290.109(b), 11(A), (12), (15)(A), (B) (West 1997).

1996 or earlier, that TNRCC did not conduct the quarterly monitoring properly by not testing during some of the quarters. Appellant relies upon his cross-examination of Ron Bearden, a team leader of the TNRCC chemical monitoring section. At one point in the interrogation, appellant took the January 12 and 19, 1996 tests of 9.2 and 9.4 micrograms per liter of benzene and averaged them at 9.3 for the first quarter, developed that there was no testing in the second quarter and used a zero, averaged the 5.4 test in August with the September test of 6.3 and got 5.8 as the average for the third quarter, and added zero for the fourth quarter where the October test revealed less than five micrograms per liter. Appellant came up with a 15.1 figure divided by four which he claimed showed an annual average of 3.7 micrograms of benzene per liter. Thus, appellant contends that there was a successful compliance under the quarterly reporting system and that he cannot legally be prosecuted criminally as alleged.

The record supports both the fact that appellant's water system was placed on quarterly monitoring in February 1996 and that oral TNRCC instructions were given to shut down the Wheeler well in January. The well apparently was out of service for only a few days. In June 1996, Dorothy Young was still trying to determine whether the Wheeler well was in or out of service. Appellant urges that his letter of April 10, 1996, to TNRCC about the work on the well was sufficient to alert TNRCC that the well was in service, although the improvements were shown not to have corrected the benzene problem.

It matters not whether TNRCC carried out the quarterly monitoring properly or was misled. Successful monitoring for four quarters under section 290.109(b)(11), (12), and (15)(A), (B) of the administrative code would entitle appellant to return to an annual or less frequent inspection

21

schedule of the water from his retail public utility. It would not, however, exempt him from criminal prosecution under the water code. The State is not required to wait a year until the completion of quarterly monitoring before taking administrative action to protect public drinking water or to seek criminal prosecution for the failure to render continuous and adequate service by a public utility company. Moreover, the evidence shows tests exceeding five micrograms of benzene per liter before, after, and during the quarterly monitoring period to support the jury's verdict.

Other than the two parts of point of error one discussed, appellant has not briefed, cited authorities, presented argument, or challenged the evidence supporting particular elements of the offense. Nothing is presented for review in this regard. *See Rocha v. State*, 16 S.W.3d 1, 20 (Tex. Crim. App. 2000); *McFarland v. State*, 928 S.W.2d 482, 512 (Tex. Crim. App. 1996); Tex. R. App. P. 38.1(h).

Viewing all the evidence in the light most favorable to the jury's verdict, we conclude a rational trier of fact could have found beyond a reasonable doubt all the essential elements of the offense charged. The first point of error is overruled.

## Factual Sufficiency

In his second point of error, appellant contends that the "evidence is factually insufficient to prove 'adequate' water, if 'adequate' means 'safe.'" Thus, appellant conditions and limits his contention.

In his brief, appellant states:

Before discussing the issue of whether appellant's water system was "adequate" in the sense that the water was safe to drink, appellant would reiterate that this case was

22

not tried on that theory. Instead, as noted earlier, the prosecution argued that the jury charge did not define "adequate" to mean "safe,"[16] and insisted that the case was about the fact the MCL levels were exceeded." . . . If the Court should somehow decide, however, that the word "adequate" should not be construed by looking to the applicable regulations, the alternative is to use the ordinary, every day definition of "adequate." In this case, moreover, "adequate" could only mean "safe," because there is no allegation, for example, that appellant did not provide enough drinking water, or that anything was wrong with the water other than the benzene levels. The issue then becomes, therefore, whether the evidence was sufficient to show that the water was not "safe."

With this being appellant's argument that the evidence is factually insufficient to sustain the conviction, we turn to the standard of review.

## Standard of Review

In a factual sufficiency review, we begin with a presumption that the evidence is legally sufficient to sustain the convictions. *Clewis v. State*, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996). However, in a factual sufficiency analysis, we view all the evidence without the prism of "in the light most favorable to the prosecution as in a legal sufficiency challenge." *Id*. at 129; *Hitt v. State*, 53 S.W.3d 697, 709 (Tex. App.—Austin 2001, pet. ref'd). A reviewing court must consider all the evidence in a neutral light, impartially comparing evidence that tends to prove the existence of a disputed fact or facts with evidence that tends to disprove that fact or facts. *See Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997); *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). Deference is given to the jury verdict, as well as the determination involving the

---

[16] The State's jury argument was in response to appellant's argument that water delivered by appellant was "safe" in light of the testimony about EPA standards on risk factors and toxicity values.

credibility and demeanor of the witnesses. *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).

A reviewing court must avoid substituting its own judgment for that of a fact finder. *Sells v. State*, 121 S.W.3d 748, 758 (Tex. Crim. App. 2003); *Westbrook v. State*, 29 S.W.3d 103, 112 (Tex. Crim. App. 2000). Early on, it was felt that a jury verdict is to be set aside "only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain*, 958 S.W.2d at 410; *Clewis*, 922 S.W.2d at 129.

In *Johnson v. State*, 23 S.W.3d 1 (Tex. Crim. App. 2000), the court expanded the *Clewis* standard of review in factual sufficiency cases to include both formulations from the civil law. There, the court stated:

> [T]he complete and correct standard a reviewing court must follow to conduct a *Clewis* factual sufficiency review of the elements of a criminal offense asks whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof. Adoption of this complete standard allows us to remain true to one of the stated goals of *Clewis*, harmonization, when appropriate, of civil and criminal jurisprudence, and it recognizes the State's burden at a criminal trial is proof beyond a reasonable doubt.

*Id*. at 11.

In *Zuliani v. State*, 97 S.W.3d 589 (Tex. Crim. App. 2003), the Court sought to clarify the complete civil appellate law formulations adopted in *Johnson* as the standards to be followed for factual insufficiency. *Id.* at 595-96. Citing *Johnson*, the *Zuliani* court wrote:

Which standard applies generally depends on whether the complaining party had the burden of proof at trial. *Id*. at 9-10. If the complaining party did not have the burden of proof at trial, then the first or manifestly unjust standard applies. *Id*. at 10. If the complaining party on appeal had the burden of proof at trial, then the second or against the great weight and preponderance standard applies. *Ibid*.

We have, however, slightly modified this approach when a defendant challenges the factual sufficiency of a guilt finding. If the defendant challenges the factual sufficiency of the elements of the offense on appeal, even though the State has the burden of proof, the reviewing court must review the evidence using both standards. *Id*. at 11; *see also Goodman v. State*, 66 S.W.3d 283, 285 (Tex. Crim. App. 2001). In other words, the reviewing court asks whether "a neutral review of all the evidence . . . demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof." *Johnson*, 23 S.W.3d at 11.

*Zuliani*, 97 S.W.3d at 595-96.

Only recently, the Texas Court of Criminal Appeals acknowledged that the evolution of factual sufficiency review since *Clewis* has been somewhat confusing. *Zuniga v. State*, ___ S.W.3d ___, No. 539-02, slip op. at 6 (Tex. Crim. App.—April 21, 2004). Finding fault with the burden of proof language *inter alia* in *Johnson*, 23 S.W.3d at 11; *Goodman v. State*, 66 S.W.3d 283, 285 (Tex. Crim. App. 2001); and *Zuliani*, 97 S.W.3d at 593-94; and finding persuasive the opinion in *In re C.H.*, 89 S.W.3d 17, 25, 45 (Tex. 2002), the court concluded that the burden of proof at trial necessarily affects appellate review of the evidence. *Zuniga*, slip op. at 7. The court sought again to clarify the required review. It stated:

We will attempt to resolve some of the confusion created by the standard that has developed since *Clewis* by: 1) linking the burden of proof at trial to the standard of review and 2) avoiding language suggestive of a preponderance-of-the-evidence burden of proof. This does not alter the standards elucidated since *Clewis*, rather it serves only to synthesize the ideas each decision has provided and to acknowledge the necessity for appellate courts to consider the burden of proof at trial when

25

reviewing the factual sufficiency of the evidence. There is only one question to be answered in a factual-sufficiency review: Considering all of the evidence in a neutral light, was a jury rationally justified in finding guilt beyond a reasonable doubt? However, there are two ways in which the evidence may be insufficient. First, when considered by itself, evidence supporting the verdict may be too weak to support the finding of guilt beyond a reasonable doubt. Second, there may be both evidence supporting the verdict and evidence contrary to the verdict. Weighing all the evidence under this balancing scale, the contrary evidence may be strong enough that the beyond-a-reasonable-doubt standard could not have been met, so the guilty verdict should not stand. This standard acknowledges that evidence of guilt can "preponderate" in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt. Stated another way, evidence supporting guilt can "outweigh" the contrary proof and still be factually insufficient under a beyond-a-reasonable-doubt standard.

*Id*. slip op. at 8.

With this background, we note that appellant acknowledged the standard of review by citing *Johnson*, 23 S.W.3d at 7, 11, and *Hitt*, 53 S.W.3d at 709. He, however, does not apply the standard to the instant conviction based on the allegations in the indictment. He does not review the proof or lack of proof supporting these allegations—the elements of the offense charged. Further, appellant does not claim that, considered by itself, the evidence supporting the verdict is too weak to sustain the finding of guilt beyond a reasonable doubt nor does he use the balancing scale between the evidence supporting the verdict and evidence contrary to the verdict.

As noted, appellant argues a theory on which the case was not tried. He contends that since the State did not prove that the "water" was unsafe, the evidence was factually insufficient to sustain the conviction. Appellant switches the focus from the evidence concerning the allegations in the indictment to his own chosen theory. Appellant relies upon the testimony of his experts, Drs. Frazier and Dideck, and the cross-examination of Dr. Benson about EPA standards regarding health

26

risk factors and toxicity values concerning benzene in drinking water. Drs. Frazier and Dideck expressed the opinion that the water from the Wheeler well was "safe" despite tests showing that maximum contaminant levels of benzene in the water had exceeded the administrative regulations as alleged in the indictment. In view of the amount of benzene, a known carcinogen, in the water as shown by the tests, Dr. Benson estimated that the water would not be adequate for people to consume. Doug Holcomb, manager of the utilities and district section of the Water Supply Division of TNRCC, stated that the 13 micrograms per liter of benzene in the Wheeler well water as tested in March 19, 1997, violated minimum drinking water standards, and he would not consider it an adequate water supply. Jimmy Jones, appellant's operator, stated that he would not want to drink water with benzene in it. Ray McBee, one of appellant's employees, would not want to expose his two-year-old child to water containing benzene.

Appellant argues that under his theory the evidence was overwhelming that the Wheeler well water was safe. He argues:

> In short, even if the Court believed that the State did not have to prove that appellant's water system was inadequate as measured by the State's own regulations, but could rely on opinion testimony that the water was not "adequate," the State still did not establish that the water was unsafe. Unless "adequate" means strict adherence to a five micrograms per liter test having nothing to do with safety, appellant's conviction cannot stand.

Appellant does not apply the standard of review for factual sufficiency to the elements of the offense as charged. Appellant offers an equitable argument that there was strong evidence that his well water was "safe" based on opinion testimony and current EPA standards on health risk estimates and toxicity values, despite any concentration of benzene in the water that was shown to

27

exceed the maximum contaminant levels of the TNRCC and the EPA. He claims that this evidence shows that the water was "adequate," probably meaning that the "service" rendered was adequate as required by the statute. We reject appellant's argument because it is based on a theory upon which the case was not tried.

We have reviewed all the evidence in a neutral light and conclude that the jury was rationally justified in finding appellant guilty beyond a reasonable doubt as charged in the amended version of count II of the indictment. The evidence supporting the verdict, standing alone and considered by itself, was not too weak to support the finding of guilty beyond a reasonable doubt. Moreover, considering impartially the evidence supporting the verdict and the evidence contrary to the verdict under a balancing scale as stated in *Zuniga*, we find that the beyond a reasonable doubt standard has been met with regard to factual sufficiency. The second point of error is overruled.

The judgment is affirmed.

_____

John F. Onion, Jr., Justice

Before Chief Justice Law, Justices Puryear and Onion[*]

Affirmed

Filed: August 26, 2004

Publish

[*] Before John F. Onion, Jr., Presiding Judge (retired), Court of Criminal Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).