# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00753-CR

**Deon Anthony Quinn, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
## NO. D-1-DC-05-301431, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Deon Anthony Quinn of the offenses of indecency with a child by contact and indecency with a child by exposure. *See* Tex. Penal Code Ann. § 21.11 (West 2003). The jury assessed punishment at 99 years' confinement for indecency with a child by contact and 20 years' confinement for indecency with a child by exposure. In three issues on appeal, Quinn contests the factual sufficiency of the evidence and asserts that the district court abused its discretion in denying his motion for new trial. We will affirm.

## BACKGROUND

The jury heard evidence that, beginning in January 2005, Quinn sexually abused K.Q., his 13-year-old daughter, on more than one occasion. K.Q. testified about one incident of abuse in

particular, occurring in early May 2005, in which Quinn touched her breasts, pulled his pants down and exposed his genitals to her, and forced her to watch a pornographic movie with him. K.Q. further testified that, approximately one or two weeks after that incident, Quinn went out for the evening and left a note for K.Q. The note, which was admitted into evidence for the jury's consideration, contained the following:[1]

> [K.Q.],
>
> Don't do like last weekend and go to sleep with [A.Q.] . . . I Know you woke up when I came in there so lets not go through that again . . . We can do it your way or my way!!!
>
> You can play on the computer while im gone chat or what ever [A.Q.] to . . . Later on tonight I want you to make my Bed please and fold the clothes ok . . .
>
> also I want you to fall asleep in MY Bed!!! get you a VCR tape movie watch it in my Room and fall asleep while I go win you some money Im giving you this $20 for now so yall can order Pizza or something or just eat something here . . . Don't try anything slick or I will come in there and wake you and [A.Q.] both up you understand . . .
>
> Love you!!!

K.Q. testified that she was scared after reading the note and decided to talk about it with her 16-year-old sister, A.Q.

A.Q. also testified. A.Q. explained that when K.Q. told her about the note, she was angry and decided to leave Quinn's apartment, together with K.Q., and go to a neighbor's house.

---

[1] With the exception of abbreviating the names of the children, we have reprinted the note exactly as it appears in the record.

2

Once there, the girls called Quinn's girlfriend, Tracy "Pinkie" Arnot, a woman whom the girls trusted and sometimes lived with, to tell her about what happened.[2] Arnot called the police.

The jury next heard from Officer William Dupree, who investigated the complaint. Dupree testified that he searched Quinn's apartment, found pornographic videos that corroborated portions of K.Q.'s statement to the police, and arrested Quinn.

The State's final witness was psychologist William Carter, who testified as an expert regarding child sexual abuse. Carter explained to the jury the dynamics involved in situations in which the perpetrator of the abuse is a family member and how Carter typically evaluated whether an accusation of abuse is true or false. Carter's testimony was limited to "hypothetical" situations, and he made no direct reference to the circumstances and allegations in this particular case.

The defense presented no evidence.

The jury convicted Quinn of one count of indecency with a child by contact and one count of indecency with a child by exposure. After hearing evidence during sentencing, including evidence of Quinn's prior felony convictions, the jury assessed punishment at 99 years' confinement for indecency with a child by contact and 20 years' confinement for indecency with a child by exposure.

---

[2] The record reflects that A.Q. told both Arnot and the police that Quinn had, in the past, also abused her, which was why A.Q. was angry about what happened to her sister. However, this evidence was not heard by the jury and Quinn's alleged abuse of A.Q. did not become an issue until the hearing on the motion for new trial.

Approximately one month later, Quinn filed a motion for new trial alleging the discovery of new evidence—K.Q. and A.Q. were recanting their trial testimony. The hearing on the motion for new trial, which lasted longer than the actual trial and involved more witnesses, was presided over by the same judge who presided over the trial.

Before testimony began in the new trial hearing, the State offered into evidence recordings of several phone calls made by Quinn from jail. At various points during the hearing, the court listened to the following:

- A conversation on May 28, 2005 between Quinn and his mother, Sheila Lucky, in which Lucky complained that Arnot should have come to Lucky before reporting the incident to the police.

- A conversation on May 29 between Quinn and Arnot in which Quinn admits that he knows "where [he] went wrong" and "what [he] did wrong" and explains that Arnot should say that she went to the police because she was angry that Quinn had cheated on her.

- A conversation on May 30 between Quinn and Arnot in which Quinn explains why he treated the girls the way he did and Arnot states that she told the girls about "forgiveness."

- A conversation on June 7 between Quinn and Arnot in which Arnot reports that she told the girls that "they do not have to say anything" and that there was a likelihood that their father "will never get out [of prison] again" if they testified.

- A conversation on June 8 between Quinn and Arnot in which Arnot insists that the girls will not testify and will recant their accusation.

- A conversation on June 14 between Quinn and Arnot in which Arnot devises a plan to explain the note Quinn left for K.Q. as referring to a surprise visit by the girls' mother.

- A conversation on October 24, after Quinn's conviction, between Quinn and his mother in which Quinn states that Arnot and the girls are the ones who got him into trouble and that they are the ones who can get him out of trouble.

4

The first witness to testify on Quinn's behalf at the hearing was Sheila Lucky, Quinn's mother and K.Q. and A.Q.'s grandmother. The girls had lived with Lucky after Quinn was arrested. Lucky testified that shortly after Quinn was sentenced, K.Q. and A.Q. told Lucky that "they had no idea that's what the sentence would be" and that they were very upset about it. Lucky further testified that the girls then told her that they had lied. Lucky denied doing or saying anything to encourage the girls to change or recant their testimony.

The district court next heard testimony from A.Q. and K.Q. A.Q. testified that she lied to the police about Quinn's abuse because she was mad at her father for dating another woman, someone by the name of "Laura." A.Q. explained that she liked living with Arnot and that she was afraid that if Quinn continued seeing Laura, she would not be able to live with Arnot anymore. A.Q. claimed that she got the idea to lie about the abuse from a movie or a television show, possibly an episode of "CSI." A.Q. denied that anyone told her to recant or change her testimony. On cross-examination, A.Q. testified that she loved her father and did not want him to go to jail but wanted him to "get help."

K.Q. testified that A.Q. told her to tell the police that Quinn had touched her inappropriately. Like A.Q., K.Q. testified that she lied about what happened because she was mad at Quinn for dating Laura. K.Q. also tried to explain the note Quinn left for her on the night she reported his abuse. K.Q. claimed that it was not referring to Quinn wanting to sleep with her, but to the fact that K.Q.'s mother was supposedly coming over to visit the girls and spend the night, and Quinn was going to spend the night with Arnot and wanted K.Q. to sleep in his room while he was away.

On cross-examination, both A.Q. and K.Q. had difficulty remembering how they were able to fabricate certain details of their accusation.

After K.Q. finished testifying, the State offered into evidence the affidavit of Lynn Craig, a victim witness counselor at the Travis County District Attorney's Office. Craig worked with both A.Q. and K.Q. prior to their trial testimony. In her affidavit, Craig stated the following:

> Both victims expressed their reluctance about being at the office and testifying at trial. They said they did not want the defendant to get in trouble or go to prison, but wanted him to get help through treatment. Both were adamant that the abuse happened and that they did not lie to the police.
>
> . . . .
>
> During the week of October 17, 2005, I accompanied [A.Q.] and [K.Q.] to trial where I observed their demeanor and listened to their testimony. [A.Q.]'s affect was flat and her testimony was short because of her reluctance to testify. [K.Q.]'s behavior in the courtroom spoke volumes. She could barely walk through the doors into the courtroom without her legs buckling. She verbalized that she was scared and did not want to testify. She immediately began biting her nails and looking at the floor when she had to walk to the witness stand. Once in the witness chair she curled into a fetal position. From my experience, [K.Q.]'s reactions appeared to be beyond the ability of a person her age to fake.

The prosecutor, Patrick McNelis, also made a sworn statement about his observations of the victims. McNelis explained to the district court that K.Q.'s reactions in the courtroom during the trial "would be impossible to fake for a child that was not telling the truth." McNelis also testified that K.Q.'s "statements on the stand were almost identical to the statement that she gave to the police back in May."

6

The district court next heard testimony from the State's expert witness from trial, psychologist William Carter. Carter testified about the factors that he considers when determining whether an allegation of abuse is true or false. Carter explained that physical evidence, such as a note to the alleged victim, handwritten by the alleged perpetrator, adds credibility to the allegation, as does consistency over the course of time in the child's description of what happened. Carter also explained the reasons why children might recant accusations of sexual abuse, pointing to factors such as feelings of guilt, family pressure, and unexpected changes in their lives resulting from the accusation and its aftermath. Carter further testified that when children who recant have difficulty remembering details about how they were able to fabricate their accusations, this suggests "that the child doesn't know why they are saying what they are saying. They just feel compelled to. They are not telling the truth because they can't back it up."

Quinn's girlfriend, Tracy Arnot, also testified. Arnot admitted that, when K.Q. was reporting Quinn's abuse, she asked K.Q. "if she understood what the repercussions would be and that she would be ruining a man's life." However, Arnot also testified that she told the girls that telling the truth was "paramount." Arnot denied ever attempting to force or coerce the girls into changing their stories.

Also admitted into evidence for the district court's consideration were A.Q.'s and K.Q.'s statements to the police, in which both girls detailed multiple incidents of sexual abuse allegedly committed by Quinn. The State also "reoffer[ed] all the evidence that was presented" during trial.

After considering all of the above evidence, the district court denied Quinn's motion for new trial and stated the following:

7

The Court finds the testimony of Sheila Lucky and Tracy Arnot is not credible. The Court finds that the children's testimony in this hearing is not truthful. It is the result of pressure and influence caused by others.

This appeal followed.

## DISCUSSION

### Factual sufficiency

In his first issue, Quinn asserts that the evidence is factually insufficient to support the jury's finding of guilt "when all the evidence is considered."

In a factual sufficiency review, we view the evidence in a neutral light and ask whether a jury was rationally justified in finding guilt beyond a reasonable doubt. *See Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then determine whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Id*. at 415. We will not reverse a case on a factual sufficiency challenge unless we can say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Id*. at 417. The fact-finder is the exclusive judge of the witnesses' credibility and the weight to be given to their testimony. *Cain v. State*, 958 S.W.2d 404, 408-09 (Tex. Crim. App. 1997).

K.Q. testified at trial, and a rational jury could have concluded that her testimony was credible, especially when the jury also considered the note that Quinn left for K.Q., which made reference to Quinn wanting K.Q. to sleep in his bed. The testimony of the child victim alone is sufficient to support a conviction for indecency with a child. *See* Tex. Code Crim. Proc. Ann. art. 38.07 (West 2005); *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. 1978); *Lee v. State*, 186

8

S.W.3d 649, 655 (Tex. App.—Dallas 2006, pet. ref'd). There was no conflicting testimony presented by the defense, and Quinn concedes in his brief that K.Q.'s "trial testimony substantiated the elements of the indictment."

However, Quinn asks us to consider in our analysis not only the evidence presented during trial, but also the evidence presented during the hearing on the motion for new trial, when K.Q. recanted her trial testimony. Quinn cites to no authority that would allow us to consider evidence not considered by the jury, and we can find none. When analyzing the sufficiency of the evidence, a reviewing court considers only the evidence that the trier of fact was permitted to consider. *See McCelvey v. State*, 143 S.W.3d 522, 531 (Tex. App.—Austin 2004, pet. ref'd). The jury did not hear the evidence presented at the hearing on the motion for new trial.

Considering all the evidence that the jury considered in a neutral light, we find that the evidence is not so weak that the verdict is clearly wrong and manifestly unjust and that the verdict is not against the great weight and preponderance of the evidence. Consequently, we hold that the evidence is factually sufficient to support Quinn's conviction, and we overrule his first issue.

**Motion for new trial**

In his second and third issues, Quinn asserts that the district court abused its discretion in denying his motion for new trial.

To be entitled to a new trial based on newly discovered evidence, Quinn was required to show that: (1) the alleged newly discovered evidence was unknown and unavailable to him at the time of trial; (2) his failure to discover or obtain the evidence was not due to a lack of diligence; (3) the new evidence is admissible and is not merely cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is probably true and will probably bring about a different

9

result on another trial. *Keeter v. State*, 74 S.W.3d 31, 36-37 (Tex. Crim. App. 2002); *Marinos v. State*, 186 S.W.3d 167, 178 (Tex. App.—Austin 2006, no pet.). The only disputed element in this case is whether the evidence is "probably true."

We review a trial court's denial of a motion for new trial for abuse of discretion. *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004). "The trial court's discretion extends to situations in which the newly-discovered evidence is the retraction of a witness's testimony." *Keeter*, 74 S.W.3d at 37. "Likewise, the trial judge determines the credibility of the witnesses and whether the new evidence is probably true." *Id*. When disbelieving the recantation of material testimony, the trial court acts within its discretion "so long as the record provides some basis for disbelieving the testimony." *Id*. at 38.

Here, the record provides multiple bases for the district court to disbelieve the recantations. First, the district court heard recordings of multiple phone calls between Quinn and his girlfriend and his mother indicating, at the very least a desire, and possibly even a scheme, to encourage the girls to recant their testimony. Although both Arnot and Lucky denied pressuring the girls to recant, the district court had discretion to assess the credibility of their denials in light of the phone calls he heard. The district court also heard evidence suggesting that both women had an ability to influence the girls, Arnot because of her close relationship with them and Lucky because of her status as their grandmother and legal custodian. In fact, Arnot even admitted that she told K.Q. that if she reported the abuse to the authorities, K.Q. would be "ruining a man's life." Arnot also admitted telling the girls "that their dad could go to prison for the rest of their life based on what they were saying." Such statements could have easily placed pressure on the girls to recant,

10

as both girls indicated that they loved their father and did not want him to go to prison. Evidence that the recanting witness was subject to pressure by family members is a basis for disbelieving the recantation. *Id*. at 38.

Another basis in the record for disbelieving the recantations was the statements by the prosecutor and the victim witness counselor that the girls' behavior and demeanor at trial indicated to them that the girls were telling the truth during their trial testimony.

The district court also heard from an expert witness on child sexual abuse who testified about the factors that he considered in determining the reliability of both accusations and recantations. The trial judge in this case was able to personally observe, compare, and contrast the demeanor, behavior, and testimony of the girls at both the trial and the hearing and thus directly assess the credibility of their recantations in light of the factors the expert discussed.

The district court also considered the statements the girls made to the police, which provided detailed accounts of multiple incidents of sexual abuse, and the incriminating note Quinn left for K.Q., which the girls were never able to fully explain away at the hearing. Although both claimed the note was referring to a surprise visit by their mother, this claim was heavily scrutinized during cross-examination. When the girls were asked to provide details and explain the meaning of certain language in the note, they were unable to do so. On this basis, the district court could have determined that the girls were not telling the truth.

11

Because the record provides multiple bases for the district court to disbelieve the recantations, we conclude that the district court did not abuse its discretion in denying Quinn's motion for new trial. We overrule his second and third issues.

## CONCLUSION

Having overruled Quinn's issues on appeal, we affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Waldrop

Affirmed

Filed: March 7, 2007

Do Not Publish