# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00654-CR

**Christopher Chon Scott, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT
NO. D-1-DC-06-302059, HONORABLE CHARLES F. BAIRD, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A jury convicted Christopher Chon Scott of the offense of murder. *See* Tex. Penal Code Ann. § 19.02(b)(1) (West 2003). Punishment was assessed at forty years' imprisonment. In three issues on appeal, Scott claims error in the jury charge, challenges the legal and factual sufficiency of the evidence, and asserts ineffective assistance of counsel. We will affirm the judgment.

### BACKGROUND

The jury heard evidence that, on September 17, 2006, Stacy Sparks was shot and killed in a motel located along IH-35 in south Austin. There was no dispute that Scott fired the fatal shot. The central contested issue at trial was Scott's state of mind in committing the act. To summarize the parties' theories at trial, the State attempted to prove that Scott had intentionally or knowingly killed Sparks during an argument by shooting her in the back of the head at point-

blank range. Scott maintained that he had accidentally shot Sparks while approaching to pistol-whip her. Scott attributed these actions, in turn, to manipulation by a friend or customer of Sparks, Leroy Wormley, while Scott was in a drug-fueled state of fear and paranoia.

On the day of the shooting, Detective Deanna Lichter of the Austin Police Department was dispatched to the motel to investigate "an unknown suspicious call where a white female was possibly dead in a room." Detective Lichter testified that, once she arrived at the room, Room 108, and opened the door, she immediately saw a woman "laying in front of the vanity area at the back of the room." The woman, later identified as Sparks, was lying "face up," with a large amount of blood around her head and what appeared to be an exit wound "right at the hairline." Lichter also observed "what appeared to be . . . bodily tissues, some debris on the vanity itself." Lichter noticed a bullet casing next to the woman's body, which indicated to her that the head wound she had observed was from a gunshot. Photographs and a video recording of the crime scene, both of which depicted the position and location of Sparks's body in the room, were admitted into evidence and shown to the jury.

Detective Frank Dixon of the Austin Police Department was also dispatched to the motel to investigate. Detective Dixon testified that he found drugs and drug paraphernalia in the room, including marihuana, marihuana cigarettes, crack cocaine, and a crack pipe. APD Detective Douglas Skolaut assisted Detective Dixon in the investigation. Detective Skolaut testified that the investigation revealed that "one of the people seen leaving [] Room 108 was a person by the name of Chris." Meanwhile, APD Officer Pete Bonilla happened upon Scott while he was working off-duty security at Seton Hospital. Officer Bonilla testified that a hospital employee informed him

2

that a man—later identified as Scott—had been brought into the emergency room by his father. The employee reported to Bonilla that the man was being "combative." Bonilla testified that he went to the emergency room and saw Scott "throwing his arms out, thrusting, [being] uncooperative." According to Bonilla, Scott was also using "cuss words," "making grunting noises," and his words "weren't making sense." Scott's medical records, later admitted into evidence, reflected that Scott had crack, marihuana, and amphetamines in his system at the time. Scott's father informed Bonilla that "something bad" had happened to Scott at a location in south Austin. Bonilla called dispatch and learned there had been a homicide in south Austin along South IH-35 near Oltorf in which Scott was a suspect.

Officers were dispatched both to the hospital and to the residence of Scott's parents. The officers spoke with Scott's mother, who informed them that Scott had been at the house earlier in the day and had left a backpack there. After the police obtained a search warrant for the residence, they recovered the backpack. They also located and collected a .45-caliber pistol from the closet of the master bedroom. Detective Skolaut, who recovered the weapon, testified that the gun was loaded with a "live round that had already been chambered," and that the safety was off.

Dr. David Dolinak performed an autopsy on Sparks's body. Dr. Dolinak testified that the cause of death was a gunshot wound to the head. Dolinak further testified that he found soot or burned gunpowder around the edges of the entry wound in Sparks's skull. According to Dolinak, the presence of soot and burned gunpowder on the entry wound could have been caused only by placing the end of the gun "right up against the skin when it's fired." Dolinak added, "If the gun is

3

held even a few inches away [from the skin], we wouldn't see this." He further opined that the cause of death was homicide and not natural death, accident, or suicide.

Jason Flater, a firearms examiner for the Austin Police Department, examined the gun recovered from Scott's parents' house and also the bullet fragments that had been recovered from Sparks's body. He determined that the bullet had been fired from this gun. Flater also determined that the gun was in "mechanically functioning condition," explaining that the weapon "didn't appear to have anything noticeably wrong with it. There were a few scuffs on the front of the slide but nothing that would hinder its operation or safety." Flater added that in order to fire this particular gun, a person would have had to exert approximately seven-and-a-half pounds of force on the trigger. Such force, according to Flater, is the equivalent of lifting almost an entire gallon of milk. Flater further testified that the bullet fired from the gun and fragments recovered from the victim's body was a "hollow-point bullet," which, Flater explained, is "designed to expand on impact" and "have a more destructive effect than a solid bullet or a full-metal-jacket bullet."

The State presented its theory of events in the motel room primarily through Leroy Wormley, who claimed to have been in the room with Scott and Sparks when the shooting occurred. Wormley explained that Sparks was a prostitute and drug user whom he had met a couple of weeks prior to the shooting. On the day of the shooting, Wormley recounted, he and Sparks had arrived at the motel at approximately the same time in separate vehicles. Wormley followed Sparks into room 108, where she was staying at the time. Inside the room were three other people—"a guy they called Big Mike," "another guy called Gabe," and Scott. According to Wormley, at least one of the men, Gabe, was smoking marihuana when they entered the room.

4

Wormley testified, "When Stacy first walked into the room, I guess Chris [Scott] jumped up off of the bed and then immediately started arguing" with Sparks, apparently over whether Sparks owed him money for the room. According to Wormley, "there was cursing, it was loud, she didn't agree to owing him any money, he said yes, and, I mean it just kind of escalated from there, if you could escalate what was already loud." Sparks "got on her cell phone and then walked into the bathroom, at which time the defendant was beating on the bathroom door saying I want my money, I want the money that you owe me." At that point, Wormley testified, "Big Mike" left the room and the argument continued:

> A: They continued to argue. You know, like I said, it was more than I wanted to be a part of, you know, just given the nature of the surroundings, and I said, hey, this is about enough of this. You know, I didn't come here for this.
>
> Q: And when you said I didn't come here for this, what did you do?
>
> A: During the course of their argument, I was kind of like just pacing front to back, front to back, and it got to that point and, you know, hearing them cursing the way that they were, you know, him asking, you know, hey, I want my money, you got some money. I think she wadded up a ten-dollar bill and threw it to him, he got it and he said you've got some money. Just give me all the money. You know, I've been paying for a lot of stuff and she said—she yelled back, you know, you're crazy. I don't go out and lay on my back and make my money just to give it to you, little boy, and I think she might have even said screw you or something at the end of that. And that was about the time I was going towards the front and reaching for the door and as I—
>
> Q: I'm going to stop you there. So you are reaching for the door. Is that to leave?
>
> A: Yes.
>
> . . . .

5

Q: What's the next thing you recall happening when you are going to leave the room and they are still arguing?

A: I remember grabbing the door handle. About the time I grabbed the door handle, I just heard a big pow, and it made me turn around . . . .

As Wormley turned around, "Gabe" ran out the door. At the same time, Wormley testified, Scott "was walking towards me with the gun pointed in my face and said you got me, my nigger, you got me." "Due to the fact that the gun was in my face," Wormley recounted, he responded, "Yeah, I got you." Then, Wormley testified, Scott told him, "You are going to take me where I need to go." Wormley agreed. Wormley also testified that Scott accused him of being an undercover police officer. According to Wormley, all of this happened within "three minutes or so" after he had entered the motel room with Sparks.

Wormley and Scott then left the motel. Wormley testified that Scott put the gun in his backpack and forced him to drive him to Scott's parents' house. Wormley claimed that Scott pointed the gun at him and directed where to drive.[1] Along the way, Scott again accused Wormley

---

[1] Wormley was somewhat unclear in explaining whether Scott had the gun in his backpack once they were in the car:

Q: During the ride, do you see the gun?

A: Yes.

Q: Okay. How is it that you see the defendant's gun?

A: I mean, because he has it on me the whole time.

Q: When you say he has it on you the whole time, what do you mean by that?

A: Well, he has the gun pointed at me while I'm driving.

6

of being an undercover police officer and of "driving too fast" and "trying to get a ticket and get us pulled over and get caught." Wormley also recounted that Scott had called his mother on Scott's cell phone during the drive. Eventually, they arrived at a residence "northeast, [in] the Pflugerville area" that Wormley discerned was the home of Scott's parents, who were outside.

Still holding the gun, Scott demanded that Wormley get out of the truck, and Wormley complied. Wormley continued:

> After I got out of the truck, he said, you know, don't move or I'll be right on you, and about that time his mom was walking down saying, you know—she said, oh, my goodness, what's wrong? What's wrong? What's going on? And at that point in time he said—they made me kill that bitch, they made me kill that bitch, she was the devil . . . .

At one point during the conversation, Wormley explained, Scott told his mother that Wormley was "an undercover cop" and that "they've been setting me up all week long." Wormley denied

---

Q: Well, when you left the hotel, he kind of had the gun in his backpack?

A: Well, all he had to do was let go. Once he pulled the backpack off his leg, the backpack just went to the floorboard and the gun is in his hand still at that time.

Q: So, while you are driving then, the backpack is down and you see the gun?

A: Right.

Q: Are you afraid while you are driving?

A: Pretty much.

7

these accusations to Scott's mother. Wormley claimed this conversation continued outside for about five or ten minutes before Scott, his parents, and Wormley went inside the house.

Once inside the house, according to Wormley, Scott continued pointing the gun at Wormley and saying "off the wall stuff" about how Wormley needed "to soldier up," "put on your motherf***ing armor," and "get ready to meet your maker," while Scott's mother tried to dissuade Scott from "doing whatever he might have been thinking about doing." Wormley testified that this continued for "at least another 30, 45 minutes." Eventually, Wormley recounted, Scott fell off of a stepladder he had been sitting on, dropped the gun, and passed out. Scott's father asked Wormley to help him take Scott to the hospital, and Wormley agreed. After arriving at the hospital, Wormley testified that he called 911 and reported the shooting.

Scott's parents testified in his defense. Scott's mother, Betty Ford, testified that when Scott showed up at her house, he seemed "very scared, very unlike himself, something was wrong with him." Ms. Ford recounted that Scott told her that "someone was after him, out to get him, that they were coming for him," and that she had the impression that Scott was worried about somebody wanting to kill him. Ms. Ford explained that Scott was "babbling on" and "foaming at the mouth and sweating" before he passed out. Scott's stepfather, John Ford, testified that when Scott first fell to the ground, "he was laying on the floor and he was what we would call in the Baptist church talking in tongues, because it was like an utterance," "(Muttering), oh God; (muttering), oh Lord; (muttering), something like that." Mr. Ford also testified about the gun that was found in the house. He explained that the weapon fell out of Scott's backpack when Scott fell to the ground. Ford claimed that he picked up the gun and put it in his closet to keep it from grandchildren in the house.

8

Scott also testified. He admitted that he had been smoking crack cocaine on a daily basis beginning about two weeks prior to the shooting. While initially consuming "a rock or two rocks" per day, Scott explained that "in the week that led up to this . . . it really went overboard." During this week, he formed a platonic friendship with Sparks centered on their "smoking rock together . . . [a]nd other drugs" in motel rooms they would rent for this purpose. Additional drug users "would come and go," using drugs while they were there. One of these individuals, Scott testified, was Wormley. Scott explained that Wormley would come in and out of the rooms "all the time," and that Sparks called Wormley her "baby." Scott inferred from this comment that Wormley was "her boyfriend or her sugar daddy."

Scott recounted his perceptions of the events leading up to the shooting. Scott testified that he came to fear that Wormley was somehow connected to law enforcement. (In fact, Wormley admitted on the stand that his brother was a police officer). These fears, Scott explained, were triggered by Wormley's talking about Scott's "criminal history," "his family and things like that." Scott asked Sparks and other people who frequented the motel rooms if they believed Wormley was working with the APD or some other government agency, but, according to Scott, "nobody really commented." Scott claimed that, approximately three or four days before the shooting, "I wanted to get away from there and so I tried to leave," but was followed by "a white van" that "was hitting their high beams" and would "drive beside me and look into the car and back up."[2] Scott perceived that the white van continued to follow him as he attempted to drive toward his mother's house. "Riding and crying the whole time," as Scott described it, and fearing for his

---

[2] Scott also referenced "a white Four Runner."

9

parents' safety, he "left from my parent's house and . . . tried to drive around I-35 and 1325 just to make sure that I wasn't being followed, and they followed me there."

According to Scott, he had moved to the motel room where the shooting occurred in an effort to evade Wormley. He was in the room with Michael Potts and Gabriel Curos when Wormley, who evidently had found them, arrived. Scott testified that Wormley "was telling me . . . if I worked with him everything will be okay, you know, financially, things like that." Scott also claimed that Wormley showed him text messages on his cell phone to the effect of "work with us, everything will be okay," "comply with them or just go along with whatever they are asking." Scott further testified that Wormley had "a briefcase or laptop looking thing" and "some kind of like a mind-reading book or a brain kind of book, something where you mess with people's minds or something."

Scott also claimed that Wormley, apparently deducing that Scott had been discussing him unfavorably with the others, threatened him, "you don't want to follow through today? I'll get you locked up for 60, 70 years. Better yet, you are going to end up under that bed right there." When asked what he thought Wormley meant by that, Scott testified, "I don't know. I mean—I didn't know if he was talking about, you know, they were going to set me up and take me to jail . . . or kill me, make it look like an accident or a robbery or anything like that." Scott perceived he was in a "Catch 22" in which he could either do what Wormley wanted him to do, or possibly be arrested or killed. Scott "felt real strongly" that "something was going to happen" that day. "Either [Wormley] was going to say, you know, you have to do something or something, you know, I don't

10

know.  Whatever it was they[3] wanted me to do, maybe he was going to call me on it or something."

Scott added, "Whatever it was, I thought it was bad because I didn't want to do it in the first place.

I didn't want to do anything to comply with him."

A "few minutes" after Wormley arrived, Scott testified, Sparks also arrived at the motel room.  Soon thereafter, according to Scott, Sparks left with Wormley "to go and score some drugs."  When Sparks and Wormley returned, Scott testified, Sparks was arguing with Wormley and calling him names.  According to Scott, Sparks went into the bathroom and closed the door.  Scott testified that he thought Wormley was angry at Sparks and wanted Scott to "do something" to her.

Scott explained, "He said . . . man, you need to do something, you know, and I was like, you know, what . . . are you talking about.  He said, man, you need to do something, you need to step up, you need to do something."  When asked what he thought Wormley meant, Scott testified, "I didn't know what he was implying, but implying me to do something to Stacy.  I don't know . . . at first, I was thinking he wanted me to confront her.  Maybe beat her up or something like that, you know."

Scott proceeded to knock on the bathroom door.  When Sparks opened the door, Scott began talking with her and asking her to give Wormley either drugs or money.  Sparks refused.

Then, Scott recounted, Wormley began "tapping on his side" and also touching his watch.  Scott perceived:

> I thought maybe he was meaning about the essence of time or something like that or I need to hurry up, I only have this chance.  If I don't take this chance that he's giving me, then it's over for me, and being over for me, I don't know whether it's like me getting shot or me getting arrested or what, or the jeopardy of my—my family.

---

[3]  Scott claimed he also feared that Potts and Curos were possibly working with Wormley.

11

Saying this is all on the line. You know what I mean? This is your chance to act, and this is what I was thinking.

Scott testified that he did not know what exactly Wormley wanted him to do to Sparks, but thought Wormley might have wanted him to "pistol whip the girl or something like that." Scott recounted that, as he approached Sparks with his gun, he was pleading with Wormley not to "make me do it." Wormley, however, continued to "hint" through his gestures that Scott "do something" to Sparks. Scott testified,

> Man, I don't know what he wants me to do. He was hinting at the gun. I picked up the gun . . . . And so when I had the gun, I walked in front of Michael and Gabriel, and Leroy. They all saw the gun. . . . They were all sitting there, and he was going like this (indicating), like, you know, you are running out of time and then he looked at them and he said we're running out of time. He looked at me, and I was like, man, what do you want me to do? . . . I said please don't make me do this, and he was turning red. And I don't know why Stacy wasn't turning around. . . . I don't know exactly how she was positioned. I know she was by the vanity. . . . I was looking at her and I was saying please, man, please, man, then all of a sudden, the door opened. I jumped. I don't know what I'm thinking, if I'm going to get shot, [or if] the cops are rushing in. I panic. Boom, the gun goes off. Okay? I'm like this (indicating). The gun goes off. I see out of the corner of my eye Stacy's body drop. I didn't turn around to look. I was in shock. So I stopped. And I was just looking straight ahead with the gun down.

Scott insisted that he "had no intent to shoot Stacy," but was just "scared" and "thought people were going to start coming in or I was going to get shot." When asked if he knew, when he pulled the trigger, that the gun was going to go off and Sparks was going to get hurt, Scott testified,

> I knew if I pulled the trigger somebody could get hurt, but I didn't have—recollectly, I didn't have my finger on the trigger or it wasn't my intention. I was thinking maybe

he wanted me to pistol whip her, like I said.  And so I was—I was pleading before I would actually go into the act of doing it because I never had anything against Stacy.  She was nice to me the whole time.  I never had a problem with Stacy.

Scott further testified about events following the shooting.  According to Scott, it was Wormley who initiated the flight from the motel, not him.  Scott proceeded to follow Wormley out the door.  Then, according to Scott, they encountered someone named "Michael Parsons" who "asked where Stacy was."  In response, Scott testified, "Leroy said that she's not here, and me, I said—I said that she's tripping."  Wormley and Scott then got into Wormley's truck, and Scott told Wormley to take him to his parents' house.  Scott recounted how he noticed that Wormley was "acting nervous" and "babbling" about helping Scott "get out of here."  According to Scott, he told Wormley, "I'm not trying to get out of here."  Then, Scott testified, Wormley pleaded with Scott not to kill him, to which Scott replied, "I'm not trying to kill you . . . just drive."  Scott denied pointing the gun at Wormley.  He testified, "I never had the gun pointed on Leroy Wormley.  I had the gun in the backpack.  It was in no way pointed at him."

During cross-examination, Scott was asked whether, in addition to crack, he had smoked amphetamines.  Scott testified,

I don't—I don't remember doing the amphetamines.  Now, it could have been like on somebody's stem or something like that.  Sometimes they have speed in the crack pipe or something like that and that's probably how the methamphetamines could have gotten in my system, but mostly crack and the weed that I had I was trying to calm down because of the situation that was going on, but mostly I was smoking crack, yes, sir.

13

Scott also admitted that he had brought a 45-caliber semi-automatic pistol—loaded with hollow-point bullets—to the motel room. However, he asserted that he did not know that there was a round in the chamber and, further, that he "did not cock the gun." When asked if he "flicked the safety off," Scott testified, "Apparently the safety must not have been on. I didn't flick any—I didn't flick anything. I didn't cock anything, I didn't flick anything." Scott speculated that, "when [he] was asleep" or "in the restroom," Sparks may have handled the gun and switched the safety off. Scott further denied putting the gun against the back of Sparks's head. He claimed that he was looking at Wormley when Sparks was shot, and he was not paying attention to the gun's proximity to her.

When asked why he shot Sparks and not Wormley, Scott testified, "What if Leroy is a police officer? I was under the impression maybe he was a police officer, he was working for APD, that's a lose/lose situation. I wasn't intending on shooting anyone." The State then asked Scott, "So at the time when you are in this situation you know it's wrong and you could get in a lot of trouble for shooting a police officer?" Scott admitted, "Yes. Yes." Scott also admitted that he did not seek help for Sparks after he shot her:

Q:   All right. You hear the pop, you feel the recoil. Where is Stacy?

A:   I see her in the corner of my eye, like I saw her—I heard her drop and I saw like her hair.

Q:   Did you see blood?

A:   No.

Q:   Okay. And you didn't check to see if she was okay?

14

Q:     You didn't call an ambulance?

A:     No.

Q:     You didn't get the hotel manager?

A:     No.

Q:     Okay.  In fact, according to you, when you left, somebody even asked for Stacy; is that right?  Mike Parsons?

A:     Yes.

Q:     And you didn't say she could be hurt; right?

A:     No.

Q:     You said she's just tripping, right?

A:     Yes.

The defense also presented the testimony of psychiatrist Maureen Burrows, who had examined Scott in an attempt to determine his mental state and any mental illness at the time of the shooting.[4]  Dr. Burrows opined that Scott had been sane at the time of the shooting, a legal conclusion that she described for the jury as "you know the difference between right and wrong and something does not interfere with your ability to know the difference between right and wrong." As for mental illness, Burrows diagnosed Scott with polysubstance dependence involving cocaine, amphetamine, and marihuana.  She further determined that at the time of the shooting, Scott had been paranoid (having unreasonable and unjustified suspicions about others) and psychotic

---

[4] Dr. Burrows had also evaluated Scott's competency to stand trial.

15

(diverging from reality). Burrows added that such a condition would "by definition" affect how Scott perceived the potential consequences of his behavior.

On cross-examination, Dr. Burrows further opined that Scott's psychosis was due solely to drug intoxication and not to bipolar disorder. Burrows was also asked whether Scott would have been able to make conscious decisions "but for the voluntary intoxication and the drug intake." Burrows answered, "With a hundred percent certainty I can't say that, but it's highly likely that he would have and that the poor decision making was based on the intoxication of the substances."

The district court submitted the offense of murder as charged in the indictment, along with lesser-included charges of reckless homicide and criminally negligent homicide. The jury was instructed that voluntary intoxication is not a defense to the commission of a crime and that if Scott engaged in conduct "while intoxicated from the voluntary introduction of an intoxicating substance into his body, that intoxication, if any, cannot serve to negate whether his conduct was engaged in intentionally, knowingly, recklessly or with criminal negligence." *See* Tex. Penal Code Ann. § 8.04(a) (West 2003). The jury convicted Scott of murder as charged in the indictment. This appeal followed.

## ANALYSIS

**Charge error**

In his first issue, Scott complains of the district court's refusal of the following jury instruction, which he timely requested:

16

> While voluntary intoxication does not constitute a defense to the commission of a crime, the jury may decide whether any evidence of mental illness lessens the defendant's culpability by finding him guilty of the lesser-included offense.

We review claims of jury charge error under the two-pronged test set out in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). We first determine whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If error exists, we then evaluate the harm caused by the error. *Id*. The degree of harm required for reversal depends on whether that error was preserved in the trial court. When error is preserved in the trial court by timely objection, the record must show only "some harm." *Almanza*, 686 S.W.2d at 171. By contrast, unobjected-to charge error requires reversal only if it resulted in "egregious harm." *See Neal v. State*, 256 S.W.3d 264, 278 (Tex. Crim. App. 2008).

On appeal, Scott seems to argue that he was entitled to this instruction because there was evidence he had shot Sparks while temporarily insane due to involuntary intoxication from amphetamines. The affirmative defense of involuntary intoxication is encompassed within the insanity defense prescribed in the penal code. *Mendenhall v. State*, 77 S.W.3d 815, 817-18 (Tex. Crim. App. 2002); *see* Tex. Penal Code Ann. § 8.01(a) (West 2003). There are two elements: (1) the accused exercised no independent judgment or volition in taking the intoxicant; and (2) as a result of a "severe mental disease or defect" caused by the involuntary intoxication, the accused did not know that his conduct was wrong. *See Mendenhall*, 77 S.W.3d at 817-18. However, as the State observes, what Scott requested was instead an instruction on "diminished capacity"—that his mental illness lessened his culpability—not that involuntary intoxication excused his conduct entirely. *See*

17

*Jackson v. State*, 160 S.W.3d 568, 573-74 (Tex. Crim. App. 2005).[5] As he acknowledges, Scott did not request a jury instruction on an affirmative defense of involuntary intoxication, much less argue that theory at trial. Consequently, the district court could not have erred in failing to submit a jury instruction based on that defense. *See Posey v. State*, 966 S.W.2d 57, 62 (Tex. Crim. App. 1998). In any event, the affirmative defense of involuntary intoxication was not raised by the evidence. Even if Scott's testimony raised an issue as to whether he, while voluntarily smoking crack and marihuana, nonetheless had exercised "no independent judgment or volition" in ingesting amphetamine,[6] the evidence did not permit a rational jury to conclude that it was the amphetamine intoxication, as opposed to his voluntary intoxication from other drugs, that had caused his paranoia and psychosis or that Scott had not known his killing Sparks was wrong. Scott's own expert, Dr. Burrows, testified that Scott was "sane" at the time of the shooting and "knew the difference between right and wrong." Additionally, Scott admitted that at the time of the shooting, he had perceived it was wrong to shoot Wormley and never claimed that he had not perceived shooting Sparks to be wrong.

Nor was Scott otherwise entitled to his requested diminished-capacity instruction. "Texas does not recognize diminished capacity as an affirmative defense i.e., a lesser form of the defense of insanity." *Jackson*, 160 S.W.3d at 573. Instead, diminished capacity "is simply a failure-of-proof defense in which the defendant claims that the State failed to prove that the defendant

---

[5] In fact, in advocating for the instruction in charge conference, Scott's counsel urged that "some of this tracks the language in *Jackson*."

[6] *See Alexander v. State*, No. 03-01-00263-CR, 2002 Tex. App. LEXIS 2048, at *8-9 (Tex. App.—Austin Mar. 21, 2002, no pet.) (not designated for publication).

18

had the required state of mind at the time of the offense." *Id*. Consequently, the Court of Criminal Appeals has reasoned that an instruction like Scott requested is not required and could constitute an improper comment on the weight of the evidence. *See id*. ("'[a] specific instruction calling attention to the evidence on appellant's impaired mental abilities was unnecessary, and might have inappropriately vested this evidence with a disproportionate legal significance in the eyes of the jury.'") (quoting *Penry v. State*, 903 S.W.2d 715, 754 (Tex. Crim. App. 1995)). Instead, what is required, the Court of Criminal Appeals has explained, is for the trial court to allow the defendant to present admissible evidence of his alleged mental impairment at the time of the offense. *See id*. at 574 ("In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.") (quoting Tex. Code Crim. Proc. Ann. art. 38.36(a) (West 2005)). The district court did so here.

The district court allowed Scott to present extensive evidence of his alleged mental impairment at the time of the offense. This evidence included Dr. Burrows's opinions; Scott's parents' observations that Scott had seemed "very unlike himself" and was "talking in tongues" when he arrived at their house following the shooting; and Scott's account of his bizarre perceptions before, during, and after the shooting. Furthermore, the district court instructed the jury regarding the lesser-included offenses of manslaughter and negligent homicide, thus enabling the jury to consider Scott's mitigating evidence concerning his mens rea when reaching its verdict. The

district court did not err in refusing Scott's requested instruction. *See id*. at 574-75. We overrule Scott's first issue.

**Evidentiary sufficiency**

In Scott's second issue, he challenges the legal and factual sufficiency of the evidence supporting his conviction.

In a legal sufficiency review, we consider whether, after viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). "This standard accounts for the factfinder's duty 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Clayton*, 235 S.W.3d at 778 (quoting *Jackson*, 443 U.S. at 319). It is not necessary that every fact point directly and independently to the defendant's guilt, but it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

In a factual sufficiency review, we consider whether, after viewing the evidence in a neutral light, a rational trier of fact was justified in finding guilt beyond a reasonable doubt. *See Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We "must be cognizant of the fact that a jury has already passed on the facts and must give due deference to the determinations of the jury." *Lancon v. State*, 253 S.W.3d 699, 704-05 (Tex. Crim. App. 2008). "A verdict should be set aside only if the evidence supporting the verdict is so weak as to render the verdict clearly wrong or manifestly unjust." *Id*. at 705; *Korell v. State*, 253 S.W.3d 405, 412 (Tex. App.—Austin 2008,

20

pet. ref'd). Therefore, we will not reverse a judgment on a factual sufficiency challenge unless we can say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the verdict. *Watson*, 204 S.W.3d at 417.

As we noted above, Scott was indicted for murder under section 19.02(b)(1) of the penal code, which defines the offense as intentionally or knowingly causing the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1). A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to cause the result. *Id*. § 6.03(a) (West 2003). A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id*. § 6.03(b). Intent and knowledge are fact questions for the jury, and are almost always proven through evidence of the circumstances surrounding the crime. *Childs v. State*, 21 S.W.3d 631, 635 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). A jury may infer intent from any facts that tend to prove its existence, including the acts, words, and conduct of the accused, the method of committing the crime, and the nature of the wounds inflicted on the victim. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). A jury may also infer knowledge from such evidence. *Id*.

Scott asserts that the evidence is legally insufficient to prove that he intentionally caused the death of Sparks. According to Scott, "under the totality of the evidence," his intent "appeared to be only to pistol whip Stacy Sparks in order to appease Wormley." Scott acknowledges that "it was possible" that he intended to harm Sparks, but contends that "there is evidence indicating an accidental shooting that was equally as strong" as the evidence supporting the State's theory of an intentional shooting.

21

The evidence supporting the jury's finding that Scott intentionally or knowingly killed Sparks included the following:

- Dr. Dolinak testified that the nature of the entrance wound on Sparks's head indicated to him that the barrel of the gun was pressed directly against her head when the shot was fired. Dr. Dolinak also opined that Sparks's death was a homicide and not a natural death, accident, or suicide.

- When the alleged murder weapon was recovered, it had a "live round in the chamber" and the safety was off. Jason Flater, the State's firearm expert, examined the gun and determined that it was in "mechanically functioning condition." Flater testified that the weapon "didn't appear to have anything noticeably wrong with it" that would "hinder its operation or safety." Flater also testified that in order to fire the gun, the person firing would have to exert approximately seven-and-a-half pounds of force on the trigger.

- Scott admitted that he had brought into the motel room a .45-caliber semi-automatic pistol, loaded with hollow-point bullets. Scott further admitted that he was holding the gun when it fired and hit Sparks.

- Wormley testified that Scott and Sparks were engaged in a heated argument immediately before the shooting.

- When Sparks was shot, Scott admitted not seeking to help her. Wormley testified that Scott instead approached him with the gun and forced Wormley to drive him to his parents' house. Once at his parents' house, again rather than call for help, Scott continued to threaten Wormley for "at least 30 to 45 minutes" while the shooting went unreported. It was Wormley, and not Scott, who finally reported the shooting.

Viewing the above evidence in the light most favorable to the verdict, we conclude that the evidence is legally sufficient to support the jury's finding that Scott intentionally or knowingly shot Sparks. Evidence that Scott and Sparks were engaged in a heated argument immediately before the shooting is probative of intent and motive to kill Sparks. The jury could also infer intent to kill from Scott's use of the gun, a deadly weapon. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996); *Pitonyak v. State*, 253 S.W.3d 834, 846 (Tex. App.—Austin 2008, pet. ref'd); *see* Tex. Penal Code

22

Ann. § 1.07(a)(17)(A) (West Supp. 2008). Also probative of intent to kill was evidence that Scott had pressed the gun against Sparks's head when firing it and that it required seven-and-a-half pounds of force to pull the trigger. Additionally, the circumstances surrounding Scott's flight from the crime scene, including his failure to report the shooting and his forcing Wormley to drive to his parents' house, allegedly at gunpoint, is evidence from which the jury could reasonably infer a consciousness of guilt.

When considering the above evidence in a neutral light, we also conclude that the evidence is factually sufficient to support Scott's conviction. Much of Wormley's account of the events surrounding the shooting was contradicted by Scott's testimony. The jury, as the trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given the testimony, and may accept or reject all or any of any witness's testimony. *McCelvey v. State*, 143 S.W.3d 522, 531-32 (Tex. App.—Austin 2004, pet. ref'd). Scott argues that there were inconsistencies between Wormley's trial testimony and his written statement to the police. However, the record reflects that the jury was not made aware of these alleged inconsistencies during Wormley's cross-examination.[7] At any rate, we would find nothing irrational about the jury disregarding any such inconsistencies or resolving them in the State's favor.

Scott also contends that the safety was off when the gun was fired because Sparks handled the gun herself prior to the shooting. He claims that this theory is supported by evidence showing that Sparks's DNA was found on the gun. However, the jury could have reasonably

---

[7] These alleged inconsistencies will be discussed more fully when addressing Scott's ineffective assistance of counsel argument.

inferred that Sparks's DNA was on the gun for another reason. DNA testing of the gun revealed that Sparks's DNA was found on both the slide and the barrel of the gun. Thus, the forensic evidence was consistent with either the defense theory that Sparks handled the gun herself, or the State's theory that Scott pressed the barrel of the gun against her head. It was the jury's prerogative to accept the State's theory and reject the defense theory, especially in light of Dr. Dolinak's testimony that the gunpowder found on the entrance wound was evidence that the gun had been pressed directly against Sparks's head when it was fired.

Additionally, Scott claims that the evidence shows that he was temporarily insane due to "involuntarily intoxication" when he shot Sparks. We have already addressed this argument. Voluntary intoxication is not a defense to the commission of a crime. Tex. Penal Code Ann. § 8.04(a). Furthermore, Dr. Burrows testified that Scott was "sane" at the time of the shooting, which, according to Dr. Burrows, meant that Scott knew the difference between right and wrong. Additionally, Scott admitted, "I knew if I pulled the trigger somebody could get hurt," and that, at the time of the shooting, he knew it was wrong to shoot a police officer. This and other evidence supports a finding by the jury that Scott had the requisite mens rea at the time of the shooting to commit the offense of murder as charged in the indictment.

We cannot say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's finding that Scott intentionally or knowingly shot Sparks. We overrule Scott's second issue.

**Ineffective assistance**

In his third and final issue, Scott asserts that the district court abused its discretion in denying his motion to dismiss his appointed trial-level counsel. This issue is predicated upon Scott's contention that his trial counsel rendered ineffective assistance. Scott complains that trial counsel failed to impeach and thoroughly investigate Wormley, failed to object to "improper burden shifting" during the State's examination of Detective Dixon, and failed to adequately prepare for the case. This "lack of preparation," Scott contends, is demonstrated by counsel's allowing the admission into evidence of "gruesome" photographs and video showing the victim's body, failing to explore the issue of involuntary intoxication, and failing to effectively question Dr. Burrows.

To prove ineffective assistance of counsel, an appellant must establish both that his trial counsel performed deficiently and that the deficiency operated to prejudice him. *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "In evaluating the first component, reviewing courts must not second guess legitimate strategic or tactical decisions made by trial counsel in the midst of trial, but instead 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]'" *Id*. (quoting *Strickland*, 466 U.S. at 689). "This means that unless there is a record sufficient to demonstrate that counsel's conduct was not the product of a strategic or tactical decision, a reviewing court should presume that trial counsel's performance was constitutionally adequate 'unless the challenged conduct was so outrageous that no competent attorney would have engaged in it.'" *Id*. at 696-97 (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)). In other words, we will not find counsel's performance deficient

25

unless it "fell below an objective standard of reasonableness." *Cannon v. State*, 252 S.W.3d 342, 349 (Tex. Crim. App. 2008) (citing *Strickland*, 466 U.S. at 687).

"In the usual case in which an ineffective assistance claim is made, 'the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking in tactical or strategic decisionmaking as to overcome the presumption that counsel's conduct was reasonable and professional.'" *Id.* (quoting *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002)).  Only in "rare ineffective-assistance cases" is the record on direct appeal sufficient for an appellate court to make a decision on the merits.  *Id.* at 350.

For each of the above alleged deficiencies by trial counsel, we do not regard the record in this case as sufficient to show that trial counsel acted outside the bounds of what any competent attorney would have done.  *See Morales*, 253 S.W.3d at 697.  Additionally, in many instances, Scott fails to show how, but for the alleged deficiencies, "the result of the proceeding would have been different."  *See Garza v. State*, 213 S.W.3d 338, 348 (Tex. Crim. App. 2007).

We first address trial counsel's performance regarding Wormley.  Scott asserts that trial counsel did not impeach Wormley with evidence of bias or prior inconsistent statements made to the police.  Further, according to Scott, "The record lacks any indication that defense counsel had explored Wormley's criminal history and relationship with the police force or any other state or government agency."

The inconsistencies to which Scott refers are found in Wormley's written statement to the police.  The statement was largely consistent with Wormley's trial testimony, although the written statement provided additional details about the events occurring before, during, and after the

26

shootings.[8]  Additionally, Wormley did not mention in his written statement that Scott forced him at gunpoint to drive to Scott's parents' house.  Also, in the written statement, Wormley stated that Scott told him they were going to his mother's house, while at trial, Wormley claimed that he did not know where Scott was directing him to go.  Defense counsel did not pursue these apparent inconsistencies in his cross-examination of Wormley.

On this record, we cannot conclude that counsel was deficient in not calling these apparent inconsistencies to the jury's attention.  "Cross-examination is an art, not a science, and it cannot be adequately judged in hindsight."  *Ex parte McFarland*, 163 S.W.3d 743, 756 (Tex. Crim. App. 2005).  The apparent inconsistencies between Wormley's trial testimony and his written statement to the police involved matters incidental to the shooting.  While drawing the jury's attention to these tangential inconsistencies might have undermined Wormley's credibility, trial counsel could have reasonably concluded that doing so would have served only to emphasize the fact that, regarding the shooting itself, Wormley's statement to the police and his trial testimony were largely consistent.

As for Scott's complaint that trial counsel failed to explore Wormley's alleged bias or his alleged "relationship with the police force," the record reflects that trial counsel cross-examined Wormley about the details of the shooting and his relationship with both Scott and Sparks, and counsel did get Wormley to admit that he had a brother who was a police officer.  Scott suggests

---

[8]  These additional details do not appear to be material to the State's case.  For example, Wormley included in his written statement the route he and Scott took to get to Scott's parents house, the fact that Wormley went to church prior to going to the motel, and what Scott was wearing during the shooting.

27

that Wormley must have been a government "snitch" and that trial counsel should have elicited this information from Wormley during cross-examination. However, the record is silent as to Wormley's criminal history and whether he was a police informant. In fact, when trial counsel asked Wormley on cross-examination if he was "under arrest or investigation for any cases," Wormley testified that he was not. On this record, we cannot conclude that trial counsel's cross-examination of Wormley fell below an objective standard of reasonableness. Furthermore, especially in light of our disposition of Scott's other issues, he has failed to show a reasonable probability that additional cross-examination of Wormley would have changed the result of the proceeding.

We next address Scott's contention that trial counsel failed to object to "improper burden shifting" during the State's examination of Detective Dixon. Scott complains that the State used the term "crime scene" when questioning Dixon before the State had proven that the shooting was a homicide. Therefore, in Scott's view, trial counsel should have objected to such terminology by the prosecutor. Trial counsel could have reasonably concluded that lodging such an objection would have been pointless and serve only to draw the jury's attention to the prosecutor's use of the term. Thus, we cannot conclude that counsel's failure to object to the use of the term "crime scene" falls below an objective standard of reasonableness.

We next address Scott's complaints about "lack of preparation." First, Scott asserts that counsel was ineffective in allowing the admission into evidence of "gruesome" pictures and video of the crime scene, specifically Sparks's body. The record reflects that trial counsel did not view the video prior to trial. However, the record also reflects that trial counsel objected to both the video and the pictures. Regarding the video, counsel stated, "I don't want the camera to linger

28

on the dead body. I mean, you know, it gets to be inflammatory after a while." The district court, perceiving counsel's statement to be a rule 403 objection, overruled it. Later, trial counsel objected to the admission of the photographs of Sparks's body on the basis that they were "unnecessarily cumulative" of the video that had already shown the body. Again, the district court overruled trial counsel's objection. We cannot conclude that trial counsel's performance fell below an objective standard of reasonableness simply because the district court overruled his objections.

Scott also asserts, "It appears that defense counsel overlooked or did not know that Mr. Scott had ingested amphetamines involuntarily, offering a plausible defense to the murder charge." We have already explained that this "involuntary" intoxication defense was not raised by the evidence. Scott has failed to make a showing that the result of the proceeding would have been different.

Finally, Scott complains about trial counsel's "failure to effectively question" Dr. Burrows, "especially during sentencing, in order to rehabilitate some incorrect assertions made regarding Mr. Scott's mental status." However, Scott does not identify what these "incorrect assertions" were, nor does he specify how trial counsel "failed to effectively question" Dr. Burrows. On this record, we cannot conclude that Scott's questioning of Dr. Burrows fell below an objective standard of reasonableness.

We conclude that none of the above alleged deficiencies constitute ineffective assistance of counsel. We similarly conclude that trial counsel's totality of representation did not fall below an objective standard of reasonably effective assistance or cause Scott harm. We overrule Scott's third issue.

29

**CONCLUSION**

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed

Filed:   February 20, 2009

Do Not Publish